## INLAND WATERWAYS PIPE LINE CO. v. LIPSTATE et al.
### No. 13037.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 26, 1934.

Rehearing Denied Nov. 30, 1934.

Wynne & Wynne and Jack Life, all of Athens, Fischer & Fischer, of Tyler, and Phillips, Trammell, Chizum, Estes & Edwards and Clayton L. Orn, all of Fort Worth, for appellant.

B. T. Fitzhugh, of Tyler, J. M. Deavenport, of Kilgore, and E. Taylor Armstrong and R. G. Storey, both of Dallas, for appellees.

DUNKLIN, Chief Justice.

In December, 1931, the Wissman Oil Company drilled an oil well on 5.08 acres of land in Rusk county, known as the McElroy lease. The well was a producer, and was operated by that company under the management of its representative, Nat Wissman, until May 27, 1932, when it was placed in charge of Col. Paul Tucker, receiver, appointed by the

district court of Smith County, who operated it until August 9, 1932. The Wissman Oil Company then resumed possession and operated the well during the remainder of August and throughout the month of September, 1932. When the well was finished, it was connected with the Inland Waterways Pipe Line Company, and all the oil produced from it during the year 1932 was turned into the pipe line of that company and was appropriated by it.

This suit was instituted by P. H. Lipstate, E. J. Koenig, L. W. Stieren, and Tom L. Tipton against the Inland Waterways Pipe Line Company to recover the value of 65,000 barrels of oil which plaintiffs alleged the defendant had illegally received and converted to its own use during the months of June, July, August, and September, 1932, because the same was in excess of the maximum amount allowable under the rules and regulations of the Railroad Commission of the state. They claimed title to the oil sued for as follows: W. J. Koenig, two-twelfths of one-eighth royalty; L. W. Stieren, two-twelfths of one-eighth royalty; Tom L. Tipton, five-twelfths of one-eighth royalty; P. H. Lipstate, one-fourth of the seven-eighths as an overriding royalty interest.

In addition to a plea of general denial, defendant pleaded specially that during the months in question it received oil from the well from Nat Wissman and the Wissman Oil Company and made full payment to said company and to plaintiffs for all the oil so received, with further allegations that it undertook to handle the oil upon assurances from plaintiffs that they owned good title thereto, but that subsequently defendant learned that plaintiffs deraigned title through certain persons claiming as heirs of Gabe McElroy, the record holder of title; that Gabe McElroy was still alive, and therefore plaintiffs never acquired title. According to further allegations, when defendant acquired that information, it required of plaintiffs a bond indemnifying it against demands of other claimants of such title and thereafter continued payment to plaintiffs as it had done theretofore for all the oil it received from the well, and all within the allowable fixed by the Railroad Commission.

Two special issues were submitted to the jury which, together with findings thereon, were as follows:

"Special Issue No. 1.

"Question: Do you find from a preponderance of the evidence that the defendant Inland Waterways Pipe Line Company, during the months of June, July, August and September, 1932, received from the lease in question any oil over and above the amount of oil paid for by said defendant?·

"Answer: Yes.

"Special Issue No. 2.

"Question: How many barrels of oil, if any, do you find from a preponderance of the evidence herein the defendant Inland Waterways Pipe Line Company received from said lease during the time inquired about in Special Issue No. 1 over and above the amount paid for by said defendant?

"Answer in the number of barrels, if any you find.

"Answer: 41,041."

Judgment was rendered for plaintiffs for the market value of 41,041 barrels of oil at the price of 98 cents per barrel, which was apportioned between them on the basis alleged in their pleadings. Supplementing the findings of the jury, the judgment includes the following recitals: "And it further appearing to the court that plaintiffs had conclusively established that they had good title to the respective interests which they asserted, as shown by regular chain of title, and further, the testimony being undisputed to the effect that defendant pipe line company recognized the interests of plaintiffs as they claim in this suit, in paying for the oil for which settlement had been made, the court, in view of such undisputed testimony, did not submit any issue of fact to the jury as to title."

The statement of facts covers some five hundred pages, and we can do no more than briefly summarize its salient features bearing on the assignments of error to be determined.

When the well was finished, a pipe was laid connecting two oil tanks on the lease with defendant's pipe line. In those two tanks oil from the well was collected; gauges were affixed for registering the amount of oil that flowed from the tanks into defendant's pipe line. Defendant's gauger would inspect those gauges, make a record of the amount of oil shown, and furnish reports thereof, one to the operator in charge, one to defendant's office, and would also keep a copy for his own convenience.

As shown by their evidence, plaintiffs instituted their suit upon the theory that through collusion between Nat Wissman, representing the Wissman Oil Company, and certain of defendant's representatives, chiefly James M. Cochran, the gauger who kept the records,

oil in excess of the amount allowable under the law had been run into defendant's pipe line and for which excess plaintiffs had been paid nothing.

The record shows that defendant had from time to time rendered accounts of oil received by it from the well, and plaintiffs had received payment for their proportionate parts thereof; and neither in their pleadings nor by the testimony of any witness was a claim made that the oil so paid for was less than the amount allowable. Indeed, J. B. May, the president of defendant company, testified without contradiction that the oil for which it had accounted was the full amount of the allowable. It thus appears that plaintiffs' demand was confined to the excess oil over and above the amount allowable by law.

There was no allegation in plaintiff's pleadings nor testimony to show the amount of allowable oil fixed for any stated period of time, although witnesses were permitted without objection to testify whether the oil runs for stated periods were within or in excess of the amounts allowable.

Plaintiffs deraigned title to the oil from Gabe McElroy, the record holder, through deeds of conveyance executed by Ambus Jack McElroy and Delia McElroy Sellers, a feme sole, as heirs of Gabe McElroy. As noted already, the defendant, in addition to a special denial, pleaded that Gabe McElroy was still alive. The burden was on plaintiffs to prove the death of Gabe McElroy in order to supply the missing link in their title. The only evidence offered to make such proof consisted of two affidavits, one by John (Bud) Flanagan, dated December 3, 1930, stating that he was 59 years old, was born in Rusk county, where he had lived all his life; that he had known Gabe McElroy and his wife, Vinnie McElroy; that Gabe McElroy died about nine years ago and Vinnie McElroy, his wife, died about sixteen years ago; and that Ambus Jack McElroy, a son, and Delia McElroy Sellers, a daughter, were the only surviving heirs of Gabe and Vinnie McElroy. That affidavit was filed and recorded in the deed records of Rusk county on January 28, 1931. Also the affidavit of Seaborn Mulberry and Abe Mulberry, both of whom stated that they had known Gabe McElroy and his wife, Vinnie McElroy, who was a sister of both affiants; also had known the mother of Gabe McElroy and her other children; that both Gabe and Vinnie McElroy are dead, leaving as their only children surviving Ambus Jack McElroy and Delia McElroy Sellers; and that said Delia McElroy Sellers had been divorced from her former husband and is now a single woman. That affidavit was dated December 22, 1930, and was filed for record in the deed records of Rusk County on January 28, 1932.

Both of those affidavits were regularly acknowledged before a notary public.

Article 3726a, Rev. Civ. St., as added by the Fortieth Legislature, reads as follows: "That the statement of facts concerning any family history and showing who were the legal heirs of any deceased person when contained in either an affidavit or any instrument legally executed and acknowledged, when any such affidavit or instrument has been of record in the Deed Records of any County in the State of Texas in which the property affected is situated for five years or more shall be received in any suit as prima facie evidence of the facts therein stated, but if there be any error in the statement of facts in such recorded affidavit or instrument the true facts may be proven by any one interested in the proceeding in which said affidavit or instrument is offered in evidence." Acts 1927, 40th Leg., p. 362, c. 244, § 1 (Vernon's Ann. Civ. St. art. 3726a).

Since the affidavits had not been filed for the requisite period of time required by that statute, the statute has no application. And manifestly the affidavits were not admissible under the common-law rule that a witness may testify on the witness stand or by deposition to hearsay declarations of members of a family concerning their family history and pedigree, etc. 17 Tex. Jur. § 252, p. 605. The affidavits were mere ex parte statements of the affiants out of court, and not on the witness stand with opportunity afforded the defendant to cross-examine the affiants as to their means of knowledge and other matters of pertinent inquiry. Hargis v. Moxon (Tex. Civ. App.) 34 S.W.(2d) 353, and decisions there noted; Owens v. Jackson (Tex. Civ. App.) 35 S.W.(2d) 186.

It was shown by testimony of H. B. May, defendant's president, that at the time the defendant's pipe line was connected with the well he was told that there was some question whether or not Gabe McElroy was dead, and he replied that he would connect up with the well notwithstanding such possible defect if the Wissman Oil Company would indemnify defendant against that risk, and that such indemnity was in fact furnished. Apparently the conclusion reached by the trial judge that the defendant had waived the right to complain in this suit of the failure of plaintiffs to supply that missing link in

their title was based upon that testimony of H. B. May.

We believe that reversible error is shown in that ruling for the following reasons: Of course, the defendant's undertaking to purchase oil from the well with full knowledge of that risk was a waiver of the right to complain that plaintiffs did not own title to all the oil that could be furnished and delivered under that contract in accordance with the regulations of the Railroad Commission; that is, all the oil that could be legally furnished. But that contract did not contemplate the sale of oil in violation of the law. Indeed, the plaintiffs' suit for wrongful conversion has its primary basis in a lack of any understanding or intention of the parties to the contract that defendant would take oil in excess of the amount allowable by law. Their suit was not for breach of contract, but for the alleged unlawful taking and conversion of oil belonging to plaintiffs and not covered by the contract. 40 Cyc. p. 261, § 4; 27 R. C. L. § 5, p. 908.

Furthermore, the rule of law invoked by appellees that one in lawful possession or with right of possession of real estate may sue to oust a mere trespasser without further proof of title is not in point. This is not a suit of that character. It is not a suit for possession, but for the value of oil alleged to have been unlawfully taken and converted. Plaintiffs had the burden of proving title to the oil converted, which necessarily involved proof of their title to the lease from which the oil had been produced. And their failure to introduce competent evidence of the death of Gabe McElroy, through whom they claimed title, was fatal to the recovery awarded to them. Oliver Chilled Plow Works v. Askey (Tex. Civ. App.) 22 S.W.(2d) 743, and authorities there cited.

Plaintiffs introduced testimony of several witnesses tending to show that oil in excess of the amount allowable had been run into defendant's pipe line. That testimony was based chiefly on estimates by different witnesses of the number of barrels run during different stated periods within the four months in controversy. E. V. Murphy, one of plaintiffs' witnesses, testified that he was employed to run the oil at night from June 15 to July 29, 1932, and from his observations of the number of oil tanks filled and emptied he estimated that an average of about 700 barrels a day were run into the pipe line while he was in charge. He further testified that he was instructed by Mr. Nat Wissman and Mr. James M. Cochran, defendant's oil gauger, to run all the oil he could.

■ Mr. Fischer, counsel for defendant, introduced Johnnie Murphy, a brother of E. V. Murphy, who surprised counsel by testifying that he was employed on the lease during the four months in controversy, and that during that time oil was run from the lease into defendant's line that was not gauged by Cochran, the gauger; that he looked after the oil runs in the absence of his brother, E. V. Murphy, and another brother, Slim Murphy, who was regularly in charge; that during his supervision oil was run an average of 750 barrels a day for 45 days; that Mr. Wissman and Mr. Cochran, the gauger, told him to run all the oil he could. Questioned as to whether he had told Mr. Fischer just before taking the witness stand that no oil had been run that was not gauged, his answers consisted of denials, admissions, and evasions. Mr. Fischer then took the witness stand and testified that just before placing Johnnie Murphy on the witness stand he had talked to him in the hall of the courthouse, and that the witness then told him that he had been employed on the lease and that no oil was run that was not gauged by the gauger.

Mr. Fischer next exhibited to the witness a purported affidavit of date January 4, 1933, with the name of witness signed thereto, and which witness admitted signing, with the further statement that he was drunk at that time but is now testifying to the truth. The affidavit embodied statements to the effect that at a time and place stated he had been offered $200 cash to testify in a suit then contemplated against the pipe line company, with this additional:

"I further state that during the time that I was around the McElroy lease with my brother or working in his place there was no oil run from said lease that the pipe line gauger did not issue a regular ticket for and said tickets were turned into the office. To my knowledge there was not a barrel of excess oil run as such from said lease.

"Witness my hand this the 4th day of January, 1933.

"[Signed]    Johnnie Murphy.

"Sworn and subscribed to before me this 4th day of January, 1933.

"[Signed]    B. H. Kyger,
"[Seal.]          Notary Public in and for
                      Rusk County, Texas."

For the purpose of impeachment, counsel for defendant offered the affidavit in evidence, and counsel for plaintiffs interposed this objection thereto, which was sustained by the court: "I object to the introduction of any affidavit; he has plead surprise, and then he has asked the witness questions and

he has not failed to respond to them, and I object to the introduction of any ex parte affidavit."

According to testimony of other witnesses, neither Johnnie Murphy nor E. V. Murphy was ever employed to run the oil into the pipe line at any time. We infer from appellee's briefs that perhaps the ruling of the court excluding the affidavit was because of testimony already given as to what he told Mr. Fischer in the hall immediately before he took the witness stand, although the statement then made was long after the date of the affidavit and not under oath. But, independently of that suggestion, we conclude that the court erred in excluding the affidavit. Morgan v. Stringer, 120 Tex. 220, 36 S.W.(2d) 468; Gulf, C. & S. F. Ry. v. Harrell (Tex. Civ. App.) 270 S. W. 187; Hord v. G., C. & S. F. Ry., 33 Tex. Civ. App. 163, 76 S. W. 227; Southwestern Coal & Improvement Co. v. Rohr, 15 Tex. Civ. App. 404, 39 S. W. 1017.

J. M. Foley was introduced as a witness for plaintiffs. He testified that, in line with his duties as an employee of the Railroad Commission, he inspected the well in controversy on July 27, 1932, and on later occasions, and made memoranda of what he discovered, such as amounts of oil in tanks, the condition of connections with the pipe line, etc., all of which convinced him that there were irregularities in the matter of oil runs into the pipe line. He had no independent recollection of those items, but was sure that the items recorded in the memoranda were correct. The memoranda so made were admitted in evidence over defendant's objection on the ground that the same could be used only for refreshing the memory of the witness. There was no error in that ruling. 17 Tex. Jur. § 329, pp. 754, 755; Fort Worth & R. G. Ry. Co. v. Cauble, 41 Tex. Civ. App. 348, 91 S. W. 244; Missouri Pac. Ry. v. Johnson (Tex. Sup.) 7 S. W. 838; International & G. N. Ry. v. Startz, 42 Tex. Civ. App. 85, 94 S. W. 207; 10 R. C. L. § 350, p. 1145; 5 Jones on Evidence, § 883; Republic Fire Ins. Co. v. Weide, 14 Wall. (81 U. S.) 375, 20 L. Ed. 894.

No reversible error is shown in permitting plaintiffs to file a supplemental petition alleging the respective interests claimed by them in the McElroy lease. Glenn v. Dallas County Bois D'Arc Island Levee District, 114 Tex. 325, 268 S. W. 452.

Nor is there merit in appellant's further contention that there was a misjoinder of causes of action asserted by plaintiffs, since there was no evidence that they did not claim title to their alleged respective interests in the McElroy lease through the same source, and since their causes of action were all based on the same facts and could be heard together without confusion or uncertainty and without prejudice to defendant in any respect. 1 Texas Jurisprudence, § 45, p. 660. Furthermore, the evidence introduced on that issue when the plea in abatement was presented clearly shows a waiver of right to urge the plea of misjoinder. 1 Tex. Jur. § 49, p. 664, and decisions there cited; 3 Tex. Jur. § 879, p. 1256.

For the reasons noted, the judgment of the trial court is reversed, and the cause remanded.